IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JUAN SUAREZ and BILLIE SUAREZ, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 13 C 4569 |
| ) | |
| W.M. BARR & COMPANY, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Juan and Billie Suarez have sued W.M. Barr & Company, Inc., alleging that Mr. Suarez suffered extensive burns and related personal injuries as a result of a flash fire that occurred when he used a cleaning solvent produced by W.M. Barr. The Suarezes' complaint alleges failure to warn and design defects giving rise to strict products liability, along with claims of negligence and loss of consortium. W.M. Barr has moved to exclude the testimony of two of the Suarezes' expert witnesses and for summary judgment. For the reasons stated below, the Court grants W.M. Barr's motion for summary judgment and denies as moot its motions to exclude expert testimony.

### Background

The following facts are not in dispute and can be found in the statements of material facts provided by W.M. Barr and the Suarezes pursuant to Local Rule 56.1(b)(3).

In April 2012, Juan Suarez set about renovating the basement of a property he

owned and managed as a landlord. After fruitlessly attempting to remove numerous large paint stains from the floor by scraping them with a hand tool, Mr. Suarez resolved to purchase and use a chemical stain remover he had seen advertised on television. That afternoon, he visited a Home Depot store to purchase a one-gallon can of Professional Strength Goof Off, a cleaning solvent manufactured and distributed by W.M. Barr.

Written on the front label of the can of Goof Off that Mr. Suarez purchased were statements that it was a "miracle remover" that "removes the tough stuff," including adhesive and glue, asphalt and tar, and dried latex paint. The back side of the can contained a label that stated, in English and Spanish, that Goof Off "cuts through the toughest spots and stains quickly. It even removes spots that would otherwise ruin your belongings." In both languages, the label on the back of the can indicated that it was "great" for removing latex paint, and it listed ideal uses on "[f]ully cured varnished and oil-based painted surfaces, vinyl baseboard, laminated counter tops, vinyl floors, solid vinyl upholstery, all metals, glass, brick, wood, concrete, grout, vinyl tops, fiberglass, hand tools, [and] most automotive surfaces." The label instructed users who wished to remove stains from concrete to "[a]pply directly. Agitate with brush. Then blot, rinse or power wash residue. Repeat if necessary." *See* Def.'s App'x Ex. I(a), dkt. no. 53-1, at 1–2.

In addition to being a highly potent stain remover, Professional Strength Goof Off is also a highly flammable chemical mixture. Acetone, its primary active ingredient (constituting 70–80% of the product), has a flash point of zero degrees Fahrenheit and evaporates easily at room temperature. Accordingly, the label on the can of Goof Off

2

that Mr. Suarez purchased contained numerous safety warnings. On the front of the can, the label included red text on a yellow background stating in English and Spanish:

> DANGER!: EXTREMELY FLAMMABLE. HARMFUL OR FATAL IF SWALLOWED. VAPOR HARMFUL. EYE IRRITANT. Read other cautions on side panel.

Def.'s Rule 56.1 Statement, dkt. no. 48, at 2. One side panel contained further warning language in English, and the other contained the same information in Spanish. The English version of these warnings stated:

> **DANGER! EXTREMELY FLAMMABLE. KEEP AWAY FROM HEAT, SPARKS, FLAME AND ALL OTHER SOURCES OF IGNITION. VAPORS MAY CAUSE FLASH FIRE OR IGNITE EXPLOSIVELY.** Extinguish all flames and pilot lights, and turn off all stoves, heaters, electric motors and all other sources of ignition during use and until all vapors are gone. **USE ONLY WITH ADEQUATE VENTILATION TO PREVENT BUILDUP OF VAPORS.** Do not use in areas where vapors can accumulate and concentrate such as basements, bathrooms and small, enclosed areas. If using indoors open all windows and doors and maintain a cross ventilation of moving fresh air across the work area. If strong odor is noticed or you experience slight dizziness – **STOP** – ventilation is inadequate. Leave area immediately. **IF THE WORK AREA IS NOT WELL VENTILATED, DO NOT USE THIS PRODUCT.** A dust mask does not provide protection against vapors.

Def.'s Rule 56.1 Statement, dkt. no. 48, at 2; Def.'s App'x Ex. I(a), dkt. no. 53-1, at 3–4. The side panels also indicated that Goof Off contains acetone and xylene, substances that make the product highly flammable.

During his deposition, Mr. Suarez testified that he read the Spanish warnings on the front and side of the can before purchasing it. (At one point, he also testified that he could not remember whether he had read the warnings on the side panel.) Mr. Suarez was aware that the product was extremely flammable, and he understood the word "flammable" to mean "something that explodes, that burns." J. Suarez Dep. at 136. Mr. Suarez made an effort to comply with the cautionary instructions on the Goof Off can's

3

label. Upon returning to the house, he entered the basement through an outside door, which he left open. He proceeded downstairs to an inside door, which he also left open. Prior to applying the Goof Off, Mr. Suarez opened a window in the basement. During his deposition, however, he indicated that he could not remember whether, prior to applying the product, he had extinguished the pilot lights on two gas-fired water heaters and a gas-fired furnace in the utility room in a separate portion of the basement.

Mr. Suarez's memory of what happened next is somewhat cloudy. It is clear that he poured some portion of the Goof Off onto the concrete floor and began spreading it with a kitchen-style broom, and that a short time later, the room became engulfed in flames. Although Mr. Suarez cannot remember exactly what he saw, he claims that the fire started on the floor where he was sweeping when a spark or flame ignited as a result of static electricity. He sustained significant injuries as a result of the fire, and he incurred substantial medical and treatment costs.

In June 2013, the Suarezes filed this lawsuit, including claims of strict products liability, negligence, and loss of consortium. In their complaint, the Suarezes allege that the product or its warnings or both were defective because the Goof Off caught on fire even though Mr. Suarez followed the label's cautionary instructions by opening the doors and windows to create adequate ventilation. The gist of their claims is that W.M. Barr failed to warn—and a reasonable consumer would not be aware—that even in a properly ventilated room, Goof Off users would need to safeguard against the risk that a static electric spark might cause a fire. The Suarezes seek damages for Mr. Suarez's personal injuries and Mrs. Suarez's loss of consortium.

The Suarezes have enlisted three experts to help make their case. First, Dr.

Kenneth Laughery has prepared a report in which he opines that the warnings on the Goof Off can, even assuming that they are compliant with federal labeling regulations, are inadequate because they are not well crafted and are unlikely to affect the behavior of a user. He also opines that the warnings are inadequate because they do not apprise users of a non-flammable alternative to Professional Strength Goof Off, namely, Heavy Duty Goof Off, a water-based cleaning solvent that W.M. Barr produces.

Second, electrical engineer Benjamin Miller used a voltage-detecting instrument and an electroscope to determine and report that the broom Mr. Suarez used to spread the Goof Off "was capable of producing a static electric charge while being used and brushing against various materials of the victim's body, clothing or surroundings." Miller Report, dkt. no. 53-6, at 3. Miller has also concluded that it is "likely that any such static charge would discharge to the concrete floor, which provided a 'ground' reference. Static discharge can produce a spark." Miller Report, dkt. no. 53-6, at 3.

Third, the Suarezes have commissioned Steve Chasteen, a Certified Fire Investigator, to provide an expert opinion regarding the cause of the fire. Chasteen relies on two sets of guidelines from the National Fire Protection Association, specifically, NFPA 921: *The Guide for Fire & Explosion Investigations* (2014) and NFPA 77: *Recommended Practice on Static Electricity* (2014). Although Chasteen did not conduct fire testing to develop his opinion, he visited the site, conducted a fire scene investigation, and consulted NFPA and other peer-reviewed reference materials. In his expert report, Chasteen states:

> [I]t is my conclusion that the most probable and most competent ignition
> source is a result of a static spark. It is the only competent and
> reasonable ignition source located within for [sic] the area of origin which
> is capable and competent enough to raise the first fuel source to its

5

ignition temperature on the floor in front of Mr. Suarez.

Chasteen Rep., dkt. no. 53-8, at 14.

W.M. Barr has moved for summary judgment and to exclude the testimony of Miller and Chasteen.

## Discussion

A party is entitled to summary judgment if it shows that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. However, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

W.M. Barr argues that Juan Suarez's claim alleging failure to warn and Billie Suarez's associated claim for loss of consortium are preempted by the Federal Hazardous Substances Act, 15 U.S.C. § 1261, and that the Suarezes have produced no evidence suggesting that the Goof Off label was noncompliant with federal law. W.M. Barr also argues with regard to Mr. Suarez's design defect and negligence claims (and Mrs. Suarez's associated loss of consortium claims) that the Suarezes have failed to produce any evidence that Goof Off was defectively designed. This is especially true,

6

W.M. Barr argues, because the opinions of Miller and Chasteen should be excluded as irrelevant and unreliable pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702.

**A.      Failure to warn claims**

In their complaint, the Suarezes allege that W.M. Barr "knew or should have known that the warnings and other relevant information and data which it distributed regarding the flammability of the product and other injuries associated with the use of Goof Off were inadequate." Am. Compl., dkt. no. 16, Count II ¶ 9. Specifically, the Suarezes allege that W.M. Barr "failed to include adequate warnings and/or provide adequate relevant information and data that would alert plaintiff Juan Suarez, to the dangerous risks of Goof Off, including, among other things, vapor migration, its volatile nature, low flash point and extreme flammability." *Id.* ¶ 15(a).

The Federal Hazardous Substances Act (FHSA) prohibits "[t]he introduction . . . into interstate commerce of any misbranded hazardous substance or banned hazardous substance." 15 U.S.C. § 1263(a). The FHSA provides, among other things, that "[a]ny substance or mixture of substances which . . . is flammable or combustible" is a "hazardous substance" under the law, *id.* § 1261(f)(1)(A), and that the Consumer Product Safety Commission (CPSC) shall define terms like "combustible," "flammable," and "extremely flammable" by regulation, *id.* § 1261(l)(1)–(3). CPSC regulations state that, with exceptions not relevant here, "any substance which has a flashpoint at or below 20° F (–6.7° C)" is "extremely flammable" for purposes of the FHSA. 16 C.F.R. § 1500.3(c)(6). Because of its high acetone and xylene content, Professional Strength Goof Off has a flash point at zero degrees Fahrenheit, rendering it extremely flammable.

7

It is therefore a hazardous substance under the FHSA and accordingly must bear cautionary labels that comply with federal law as set forth in both the FHSA and all associated regulations issued by the CPSC and published in the Code of Federal Regulations.

Numerous courts have held that plaintiffs may bring state law failure-to-warn claims based on a theory that a hazardous product's label failed to comply with the strictures of the FHSA's labeling rules. *Mwesigwa v. DAP, Inc.*, 637 F.3d 884, 887 (8th Cir. 2011); *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 109 (2d Cir. 2001); *Torres-Rios v. LPS Labs., Inc.*, 152 F.3d 11, 13 (1st Cir. 1998); *Moss v. Parks Corp.*, 985 F.2d 736, 740–41 (4th Cir. 1993); *Kirstein v. W.M. Barr & Co.*, 983 F. Supp. 753, 761 (N.D. Ill. 1997), *aff'd*, 159 F.3d 1065 (7th Cir. 1998). Every one of those courts has also held, however, that the FHSA preempts any state tort claim alleging that a product subject to the FHSA failed to warn because it should have included a more elaborate or detailed warning than federal law requires. *See Mwesigwa*, 637 F.3d at 887; *Milanese*, 244 F.3d at 109; *Torres-Rios*, 152 F.3d at 13; *Moss*, 985 F.2d at 740; *Kirstein*, 983 F. Supp. at 761. Accordingly, a plaintiff may prevail on a failure-to-warn claim concerning a hazardous substance and its principal hazard only where the plaintiff can demonstrate that the product's label did not comply with the FHSA and associated CPSC regulations. The Court finds these decisions persuasive.

No reasonable jury could find that the Professional Strength Goof Off label is inadequate under the FHSA based on the evidence the Suarezes have produced. In order to prove a defendant has provided inadequate warnings under the FHSA, a plaintiff must demonstrate that a defendant's product failed to, prominently and in

conspicuous and legible type, bear a label

> (1) which states conspicuously . . . (C) the signal word "DANGER" on substances which are extremely flammable, corrosive, or highly toxic; (D) the signal word "WARNING" or "CAUTION" on all other hazardous substances; (E) an affirmative statement of the principal hazard or hazards, such as "Flammable", "Combustible", "Vapor Harmful", "Causes Burns", "Absorbed Through Skin", or similar words descriptive of the hazards; (F) precautionary measures describing the action to be followed or avoided . . . .

15 U.S.C. § 1261(p). The CPSC regulations further define "principal hazard" as "the principal or primary hazard(s) associated with a hazardous substance," and they provide examples such as "harmful or fatal if swallowed," "vapor harmful," "flammable," and "skin and eye irritant." 16 C.F.R. § 1500.12(a)(2)(vii). The regulations also describe what "prominently" and "conspicuously" mean in relation to the location, size, and style of typed warnings. *See id.* § 1500.121. In order for a warning of a principal hazard to appear "prominently," it must be printed horizontally, that is, parallel to the base of the product. *Id.* § 1500.121(b)(1). The front panel of the product's label must feature, set apart from other graphic material, a warning that includes the appropriate signal word, followed by the principal hazard(s) "and, if appropriate, instructions to read carefully any cautionary material that may be placed elsewhere on the label." *Id.* § 1500.121(b)(2). In order for a warning of a principal hazard to appear "conspicuously," the signal word and statement of principal hazard must be in capital letters. *Id.* § 1500.121(c)(4). The color of the warning test must be "in sharp contrast with the color of the background upon which such a statement appears." *Id.* § 1500.121(d)(1).

The Goof Off label appears to comport with all of these requirements, and the Suarezes have adduced no evidence that suggests otherwise. The principal hazard of

Goof Off is its extreme flammability. On the front and side panels of the Goof Off can, the words "DANGER: EXTREMELY FLAMMABLE" are printed in red ink on a yellow background, parallel to the base of the package, in capital letters. (They are also printed in both English and Spanish, though the FHSA requires only that English warnings be printed on hazardous products.) The front panel further instructs users to "[r]ead other cautions on side panel." The side panels provide, in English and Spanish, a list of precautionary measures that a user should take to prevent the harms associated with the product's extreme flammability.

    The Suarezes have made no specific contention that W.M. Barr failed to comply with any of the statutory or regulatory requirements governing labeling of hazardous products; they do not seem to dispute that the label satisfies those requirements. In an attempt to skirt preemption, the Suarezes endeavor to recast the hazard about which W.M. Barr should have provided warning. They argue that irrespective of whether Goof Off's label complied with the FHSA regarding its extreme flammability, the label did not alert consumers to the dangers of vapor migration or exposure to static electricity. But these are secondary hazards that only pose a threat due to the product's extreme flammability, and the FHSA does not require manufacturers to provide detailed warnings about every possible way in which a product's principal hazard might manifest. Professional Strength Goof Off's primary hazard is its extreme flammability, and the product's warning advises that the precautionary measures a consumer should take include keeping the product's dangerous vapors, which "may cause flash fire or ignite explosively," away from "heat, sparks, flame and all other sources of ignition." The label need not indicate the distance at which an open flame or spark can safely be lit, and it

need not name the various ways in which a spark or flame might come into existence. *See Mwesigwa*, 637 F.3d at 889 ("The label complies with the FHSA because the principal hazard to be avoided is flammability, and the way to avoid that hazard is to remove all potential ignition sources.").

The only evidence the Suarezes have offered concerning the warnings is the expert opinion of warnings expert Kenneth Laughery. Laughery's opinion, however, has no bearing whatsoever on whether Goof Off's warnings satisfy the requirements of the FHSA and CPSC regulations. Although Laughery concluded that the warnings on the Goof Off label were inadequate, he did so based on his learned opinion regarding the efficacy of warnings, not based on the standards provided under the FHSA. In fact, Laughery made clear that for the purposes of rendering his expert opinion, he assumed that the product's label complied with federal law. During his deposition, he stated that his opinions were solely directed toward the question of whether the warnings were sufficient *above and beyond* the requirements imposed under the FHSA. Laughery explained:

> Q: All right. So you don't have any opinion as to whether this product complies with the requirements of the Consumer Product Safety Commission, correct?
>
> A: I assume it does.
>
> Q: And with respect to the Federal Hazardous Substances Act, do you have any opinions as to whether this product complies with the regulations of the Federal Hazardous Substances Act?
>
> A: No.
>
> Q: Is it your opinion that if . . . Goof Off complies with the standards of the Consumer Product Safety Commission and the Federal Hazardous Substances Act, that it is not an unreasonably dangerous product?

11

>   A: No.
>
>   Q: And what is your opinion in that regard?
>
>   A: Well, it's generally recognized that the government guidelines such as those are minimums and it doesn't necessarily mean that they comply with what the research and publications and knowledge about warning design and effectiveness would indicate.

Laughery Dep., 45:18–46:17. In other words, even if a jury found Laughery's opinions persuasive, it would not be permitted to rely on these opinions to support the Suarezes' claim that Goof Off was misbranded under the FHSA—the only claim that, if proven, would establish liability for failure to warn. In sum, the Suarezes have failed to produce evidence from which a reasonable jury could find in their favor on a failure-to-warn claim given the preemptive effect of the FHSA. The Court therefore grants summary judgment in favor of W.M. Barr on Counts 2 and 5.

**B.  Strict liability and negligence claims**

As the Suarezes correctly point out in response to W.M. Barr's motion, the FHSA does not preempt claims predicated on state-law strict products liability or negligence. In Count 1 of their amended complaint, the Suarezes allege that the Goof Off was defective and unreasonably dangerous as designed because of its "vapor migration characteristics, flammability, volatility, low flash point, and an upper explosive level unsuitable for use in the home." Am. Compl., dkt. no. 16, Count 1 ¶ 9. They also allege that there existed "safer alternative designs other than the one used, which were economically and technologically feasible that would have prevented or significantly reduced the risk of accident and/or injury in question without substantially impairing the product's utility." *Id.* ¶ 11. In Count 3, the Suarezes allege that W.M. Barr failed to exercise due care by negligently designing the Goof Off, failing to test it to ensure a

sufficiently high flash point, failing to train sellers as to the product's associated dangers, and failing to warn, instruct, inform, and alert purchasers of the dangers of the product before or after purchase. *Id.*, Count 3 ¶ 10. These allegations also form the basis of Billie Suarez's loss of consortium claims in Counts 4 and 6, respectively.

In order to prevail on a strict liability claim under Illinois law, "a plaintiff must plead and prove that the injury complained of resulted from a condition of the product, that the condition was unreasonably dangerous, and that it existed at the time the product left the manufacturer's control." *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 525, 901 N.E.2d 329, 335 (2008); *see Sollami v. Eaton*, 201 Ill .2d 1, 7, 772 N.E.2d 215, 219 (2002). Illinois courts determine whether a product is unreasonably dangerous by applying the so-called consumer-expectation and risk-utility tests. *Baley v. Federal Signal Corp.*, 2012 IL App (1st) 093312 ¶ 57, 982 N.E.2d 776, 790 (2012); *Salerno v. Innovative Surveillance Tech., Inc.*, 402 Ill. App. 3d 490, 498, 932 N.E.2d 101, 109 (2010). These tests "are not *theories of liability*; they are *methods of proof* by which a plaintiff may demonstrate that the element of unreasonable dangerousness is met." (Emphasis in original.) *Mikolajczyk*, 231 Ill. 2d at 548, 901 N.E.2d at 348 (citation and quotation marks omitted).

The Suarezes try both approaches, but they have produced insufficient evidence to support either of them. First, they attempt to prove their claim by use of the consumer-expectation test. "[U]nder the consumer-expectation test, a plaintiff may prevail if he or she demonstrates that the product failed to perform as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." *Calles v. Scripto-Tokai Corp.*, 224 Ill. 2d 247, 257, 864 N.E.2d 249, 256 (2007)). The

Suarezes claim that Goof Off was unreasonably dangerous because an ordinary consumer like Juan Suarez would not expect the product to catch on fire when used in a reasonably foreseeable way. But in Mr. Suarez's deposition, he testified that he read Goof Off's label and understood the product to be extremely flammable. The evidence suggests that the Goof Off caught on fire either when the vapors from the product migrated to the pilot lights of the water heaters in the utility room or when a static spark ignited the product on the floor where Mr. Suarez was applying it. Regardless of where the spark originated, an ordinary consumer certainly would expect that exposing an extremely flammable product to a spark or flame might result in a fire, especially if that product indicates (and the user reads) on its label that the product is "extremely flammable" and instructs the user to "keep [it] away from heat, sparks, flame and all other sources of ignition" because "vapors may cause flash fire or ignite explosively."[1]

The risk-utility test is likewise unavailing. Under the risk-utility test, a plaintiff may succeed by proving that "the magnitude of the danger outweighs the utility of the product, as designed." *Id.* at 259, 864 N.E.2d at 257. Illinois courts consider the availability of feasible alternative designs, the degree to which the product conforms to industry standards and government regulations, the product's utility to the user and the public, the likelihood that the product will cause an injury, and the manufacturer's ability to affordably eliminate the product's unsafe characteristics without impairing the

---

[1] This is why the Court need not address W.M. Barr's argument that the testimonies of experts Miller and Chasteen should be excluded. Even if their testimony is not excluded, it serves merely to support the contention that the spark that ignited the Goof Off was created by static electricity rather than unextinguished pilot lights in the utility room. The source of the spark is immaterial regarding whether an ordinary consumer would expect such spark to cause a fire when it comes into contact with an extremely flammable product.

14

product's usefulness. *Jablonski v. Ford Motor Co.*, 2011 IL 110096 ¶ 85, 955 N.E.2d 1138, 1154 (2011).

The Suarezes have not made an effort to adduce any evidence regarding the utility of the product to the public, its conformity with industry standards, or the costs and benefits that would inure if W.M. Barr somehow found a way to make Professional Strength Goof Off non-flammable. Instead, the Suarezes attempt to demonstrate that Professional Strength Goof Off is unreasonably dangerous under the risk-utility test by claiming a feasible alternative design exists. Pointing to W.M. Barr's water-based Heavy Duty Goof Off, which is not flammable and is better suited than Professional Strength Goof Off to remove paint from a basement floor, the Suarezes claim that there exists an alternative to Professional Strength Goof Off.

But the record lacks any affirmative evidence supporting this claim. Under Illinois law, a plaintiff seeking to prove a design defect by use of the risk-utility test is not required to demonstrate that an alternative design exists. *See Mikolajczyk*, 231 Ill. 2d at 546, 901 N.E.2d at 347. But this is the method by which the Suarezes have attempted to show that Professional Strength Goof Off's risks outweigh its benefits. The evidence in the record does not indicate that Heavy Duty Goof Off is indeed an alternative to Professional Strength Goof Off. Rather, the evidence shows only that Heavy Duty Goof Off exists, it is a water-based product, and it is a weaker cleaning solvent than Professional Strength Goof Off. No reasonable jury could find, based on this paucity of evidence, that Heavy Duty Goof Off constitutes a feasible alternative design of Professional Strength Goof Off.

Finally, the parties devote almost no attention to the Suarezes' negligence

claims, but summary judgment in W.M. Barr's favor is warranted on those claims as well. Both parties likely bypass this issue due to the fact that under Illinois law, a plaintiff whose case fails the risk-utility test also fails to support a negligence claim. *See Jablonski*, 2011 IL 110096 ¶ 86, 955 N.E.2d at 1155 ("Numerous commentators have concurred that the balancing test developed for strict liability claims, which examines whether a product is unreasonably dangerous, is essentially identical to the test applied in determining whether a defendant's conduct in designing a product is unreasonable and that any distinction is mere semantics."). Furthermore, the threshold question for a products liability negligence claim is whether a defect in the product made the product unreasonably dangerous. *Baltus v. Weaver Div. of Kidde & Co.*, 199 Ill. App. 3d 821, 829–30, 557 N.E.2d 580, 585–86 (1990). To succeed on a negligence claim, the evidence must show that an unreasonably dangerous defect caused Juan's injuries. *Id.* As explained above, the Suarezes have failed to offer evidence from which a reasonable jury could conclude that a design defect existed.

Moreover, the Suarezes have adduced no evidence to support any of the non-preempted allegations contained in their negligence claims. In Count 3 of their amended complaint, paragraph 10, the Suarezes allege:

> That notwithstanding the aforesaid duty, the Defendant, by and through its duly authorized agents, servants and employees, was guilty of one or more of the following acts and/or omissions:
>
> (a) negligently designed the product with an extremely low flash point, thereby making the product inappropriate for household use;
>
> (b) negligently failed to test the product to ensure the design has a high enough flash point so that the product is not unreasonably dangerous for household use;

16

>   (c)   failed to adequately train and assist sellers in the dangers associated with the product;
>
>   (d)   failed to disclose known problems and defects;
>
>   (e)   failed to meet or exceed internal corporate guidelines;
>
>   (f)   failed to inform the consumer, including Juan Suarez, of information that Defendant knew about the dangerous nature of Goof Off, thus depriving the plaintiff, Juan Suarez, of the right to make a conscious and free choice;
>
>   (g)   failed to provide adequate warnings regarding the flammability of the product;
>
>   (h)   failed to provide adequate instructions regarding the use of the product;
>
>   (i)   failed to alert the consumers of the dangers of migrating vapors;
>
>   (j)   failed to comply with the standards of care applicable in the industry insofar as providing reasonable and thorough instructions and warnings for use of the product; and
>
>   (k)   failed to notify consumers, after the sale of the product, that a defect exists in the product that relates to the consumer's safety.

Am. Compl., dkt. no. 16, Count 3 ¶ 10.

As explained above, federal law preempts state law claims seeking to impose liability on W.M. Barr for failure to do more than is required under the FHSA to apprise consumers of Goof Off's primary hazard (extreme flammability, defined by a sub-20° F flash point), which is precisely what the allegations in subparagraphs (f), (g), (h), (i), (j), and (k) seek to do. And although federal law does not preempt common law liability where evidence supports allegations of the sort contained in the other subparagraphs, there is simply no evidence in the record to support them. The Suarezes have not adduced evidence that products with low flash points are inappropriate for household

17

use, nor have they adduced evidence that W.M. Barr failed to test its product, failed to abide by corporate guidelines, or failed to disclose defects in the product.

The record contains no evidence from which a reasonable jury could find that Professional Strength Goof Off is defectively designed or that W.M. Barr was negligent in the design, advertising, or sale of its product. The Court accordingly grants summary judgment in favor of W.M. Barr on Counts 1, 3, 4, and 6.

**Conclusion**

For the foregoing reasons, the Court grants defendant W.M. Barr & Co.'s motion for summary judgment, terminates their motions *in limine* [dkt. no. 59], and directs the Clerk to enter judgment in favor of defendant W.M. Barr & Co., Inc. and against plaintiffs Juan and Billie Suarez. The trial date of December 7, 2015 is vacated.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: October 20, 2015